Yes, Your Honor. Learned Counsel, members of the court, may it please the court. My name is Kelly Kum. I'm a criminal defense lawyer, trial lawyer from Pocatello, Idaho, small community. And I will never profess to be an appellate lawyer, so any mistakes I make throughout the course of this argument, I apologize. I apologize in advance to the students who are here. If they're here to see some kind of eloquent argument, I'm not the example that they should be looking at. Why don't you just tell us why your client should prevail? My client should prevail, Your Honor, because this is about a motion to recuse the Honorable Chief Judge Windmill, who was the trial judge who was sitting on my client's case. He filed that motion a considerable time after the case started, and there have been a number of delays. And I'm sure that one of the main concerns that the government is going to talk about today is the timeliness. But I want to talk with whatever time I used in the first part of my argument here about the factors that should be considered, emphasizing to the court, again, that this is a reasonable person test. And the reason my client should prevail, I believe, is that when applying that reasonable person test to a determination of whether recusal should be granted or not, I think the facts in this case would warrant a recusal. And I believe that in looking at the judge's written order, and that's found in the excerpts of record at 116 through 120, there are a number of, I believe, indications in the judge's order that to me demonstrate that the judge didn't look at this, even though he stated he was, from the perspective of the reasonable person. The judge talked about, for example, the Greenspan case, which was a Tenth Circuit decision. I think it was out of New Mexico. That was interesting because the court later rejected an application of the Nettles case because it was not the law of the circuit. And, of course, Greenspan is not the law of the circuit as well. Your client filed the motion to recuse only after Judge Windmill had refused the plea bargain, right? That's correct, Your Honor. And he waited, what, a year? Not a year. Go ahead. I'm sorry. Am I wrong that a year passed from the time Judge Windmill was assigned until the motion was made? A year had passed from the time the judge reassigned the case to himself until the motion was made. That's correct, Your Honor. And once it was reassigned to Judge Windmill, if he wanted to seek recusal, the threat was there, right? The letters had been sent. That's correct. Whether they were received or not apparently is the subject of some dispute. But the subject matter of the recusal motion was right there, wasn't it? The subject, the threats themselves, yes. Your client, you, could have made the motion to recuse the moment it was reassigned to Judge Windmill. Well, not me personally. I wasn't the attorney at the time. Oh, the trial lawyer. That's correct, Your Honor. That could have been done. And as I indicated in my argument at the time and in my brief as well, I believe that there's adequate explanation for the delay. And as far as my part in this. What is it? My, when I came on. What's the explanation for the delay? When I came on in roughly September, which was roughly three months after the last threat of June of 2004, we entered into a very sophisticated plea bargain. And I don't want to go into all the details of that plea bargain now because of time constraints, but it was an 11C1 plea agreement that obviously was binding on the court. We intended from September on that that was going to be the purpose of that plea bargain, or plea agreement, I'm sorry. And so we knew that the judge's discretion was going to be severely restricted. Based upon that, my client didn't feel like there was a need to go ahead with a recusal motion. What you're saying is he didn't recuse him until he lost. Pardon? You didn't see fit to recuse the judge until after you appeared before him and got a disappointing ruling. That's correct. Well, isn't that judge shopping? Isn't that just what Judge Windmill said is judge shopping? Well, that's obviously the way Judge Windmill looked at it, too. But I don't believe that it was, Your Honor. I don't believe that it was judge shopping because it wasn't until there was no plea agreement in place that we realized, and again, we're looking only at prospective proceedings here. We're not asking. The reason there was no plea agreement in place is because Judge Windmill refused it. That's correct. That's correct. But, you know, the one side of that argument is, well, we are reacting to the denial of the plea agreement. We now believe that because he rejected the plea agreement that he's no longer able to give us a fair trial. I don't think that the record supports that notion at all, Your Honor. I think that the record supports that this was in place two years previously. Didn't your client at one point admit that the reason he had sent these letters was to move from state to federal custody? Well, that's interesting, too, Your Honor. Can you start with a yes or no? Yes. That is correct. That is correct. Do you have an explanation? I do, Your Honor. Go ahead. I think that the problem with that is, and I apologize. I need to collect my thoughts here briefly. But my client, I'm sorry. Could you repeat the question? I'm sorry. I totally lost it. We have this circumstance. More than approximately a year passes from the time the case comes back to Judge Windmill. It had been with an out-of-district judge before, Lloyd George from Nevada, right? Correct. So the better part of a year goes by. The substance of the reason for the motion to recuse, the sending of the threatening letter, is there that entire period of time. Correct. Then he rejects the plea agreement, and a month or so later, the motion to recuse is filed. Correct. But your question, I think, was whether or not my client was indeed serious about the threat. Well, it's the combination of things that Judge Windmill pointed to. One, the threat may not have been a real life-threatening threat. It may simply have been a device to move from state custody to federal custody to effect a transfer. The second thing is no motion made during the period of time. And the third thing is it's made virtually right after you receive a disappointing ruling. And those are the bases that the judge relied upon in denying what's wrong with those bases. I think those bases don't come under the reasonable person test. And I want to respond, first of all, to the issue that the threat wasn't serious. If the threat isn't serious, intent to harm is an element of the statute, Your Honor. My client pled guilty to that. And I think that if he's not serious, then how can he be convicted of those counts? So I think that warrants some consideration against that notion. But all of those factors that you're talking about, I think those are facts that are found by the judge somehow independently of the record. I don't think that those are facts that really should be considered by the reasonable person in that objective standard that we're looking at here. And that's the problem that I have with this case from the very beginning and from the judge's findings. He's making determinations that it wasn't a serious threat. Where does that fact come from in the record? He's making determinations of, you know, that my client didn't have the ability to carry out the threats. That's another example. That's not a fact that's in the record. And those are different from the Nettles case. We're down to about a minute and a half. Do you want to save a little time for rebuttal? I think I will. I think I'll reserve the remainder of mine for rebuttal. Thank you for your argument. Thank you. We'll hear from the United States at this time. May it please the court, counsel. My name is Michael Fica. I'm an assistant United States attorney from Pocatello, Idaho. I'm a colleague and office mate of Mr. Haycock, who is counsel of record in the district court for this case. With the court's permission, I'd like to first address the issue of timeliness, because I think it's a good starting point. And I would note that Judge Windmill specifically rejected under Section 144 motion for reprisal because of the lack of timeliness with regard to specific violence. Such requirements aren't, admittedly, as stringent under Section 455. And there was some suggestion in Judge Windmill's decision that he was, nevertheless, finding that the motion was not filed in a timely fashion. But I think it goes one step further than that, Your Honor, with regard to timeliness. And as the court mentioned, it was clear from the record that, in fact, what had happened is the second set of threatening letters, I believe, Your Honor, were sent in June of 2004. The motion for refusal wasn't filed until August of 2005, just approximately 30 days after the denial of or the rejection of the plea agreement. But beyond that, Your Honor, what's telling about that, because I think that suggests somewhat that there may have been forum shopping or an attempt to recuse, what's interesting from my perspective, Your Honor, about that point is the fact that, essentially, it seems to me that counsel wants it both ways. Counsel argues that we should apply a reasonable person standard, that, in essence, it does not matter whether or not the judge had any actual bias or had any feeling of an actual threat. The only consideration this court should give is what a reasonable person would perceive was happening. But then counsel wants to say and see there potentially was bias because the judge rejected the plea agreement. Well, in essence, Your Honor, the fact that there were ongoing plea agreements and that the plea agreement was rejected in July of 2005 wouldn't have changed the fact that an outside observer observing the proceedings could perceive a bias. Essentially, counsel argues there must have been a perceived bias because Judge Windmill rejected the plea agreement. In fact, Your Honor, the reasonable person standard, if that's the standard that this Court wishes to adopt from the 10th and 7th Circuit, doesn't delineate that. I think we have plenty of case law in this circuit. Pardon me, Your Honor? We have plenty of case law in this circuit on timeliness and whether a threat is real and that sort of thing. I'm sorry, Your Honor. Correct? That is correct, Your Honor. Nevertheless, Your Honor, I think in review of the 10th Circuit decision in Greenspan and the 7th Circuit decision in Nettles, the reasoning behind recusals is somewhat telling there. And in fact, in terms of exercising his discretion, I think Judge Windmill referred to those decisions and considered those decisions. May I ask you a practical question? Certainly, Your Honor. Leaving aside the timeliness problem for a moment, you have a defendant who sends a letter to the judge saying, in effect, I'm going to blow up the courthouse. And the question before us is whether the judge's impartiality might reasonably be questioned. Why don't those circumstances give rise to an inference that, you know, someone might question the impartiality of the judge since the defendant is threatening to blow the place up? Well, in regard to the facts of this case, I think given your scenario, I might have to concede. But the facts are a little more complicated with regard to the facts of this case. For example, first of all, there's no real clear record as to what the perceived or what the identified threat was. Indeed, the record's clear that Judge Windmill never received the letter. The letter specifically addressed to Judge Windmill was misaddressed and sent back to the ---- He was aware of its contents, wasn't he? He was not. And, in fact, he identified on the record that he didn't he really, in fact, at the time of recusal, stated that he didn't even realize that a letter had been received. He was reminded that a year previously, upon motion of the government, he entered an order restricting the defendant from sending out any letters. But went further as in stating at the very start of the proceeding that he had no idea. He didn't recall the letter being received. He had not reviewed the letter. Now, are you talking about the letter addressed to him or the letter saying, I'm going to blow up the courthouse? The letter addressed to him, Your Honor. Didn't he say that he had a standard procedure that if a letter of that nature was addressed to him, it was screened out by his staff and sent to the authorities and he would not hear what the contents were? That is correct. And he even went further, Your Honor, and pointed out that if there had been any kind of identifiable threat to him, it was his practice that those letters would go to the U.S. Marshal Service and he'd requested that he only be told when the Marshal Service felt like there was any possibility of any real threat to he or his family. And he went on in the record to say he was never notified by the Marshal Service that there was any threat that he should feel directly. Who entered the order telling the detention people don't let Holmes send any more letters? That was Judge Windmill, Your Honor. So Judge Windmill knew that he was sending threatening letters? He did, Your Honor. He did. But, again, what's worthy of note even then, Your Honor, and really this goes to, I think, the reasoning behind when recusals are not allowed in the Tenth Circuit by way of the Greenspan decision. What's worthy of note, Your Honor, is when Mr. Holmes sent the letter specifically to Judge Windmill and other letters that precipitated that order. Another person that he sent a letter to was his Honor, Judge George, who was at that point the judge assigned to the case. When the second set of letters was sent out in June of 2004, amongst other federal agencies that letters were sent to, Judge George received a letter and actually received it in chambers and apparently, based upon the record, opened it. And an attempt was made to send the letter to Judge Windmill. The ultimate conclusion of the Strickland Court, Your Honors, was that what we can't allow in a situation like this is form shopping. And that was a concern in the judge's decision. And Strickland went on to point out, and really this leads to my final comment, but Strickland went on to point out two specific scenarios or facts wherein we can identify that there may be an attempt to do form shopping. One is where, as opposed to a general threat, such in Strickland, where there was no specific threat made to the judge, but indeed a plan was uncovered to do harm, where there's a specific threat to a judge or an attempt to specifically threaten the judge, such as Mr. Holmes did here. And secondly, where, as Strickland points out, a defendant is making multiple threats to multiple judges who potentially could sit in a case. That gives strong inference that the defendant is attempting to essentially form shop or seek recusal. We have both of those situations here. In this case, we have a letter addressed or attempted to be delivered directly to Judge Windmill. And at the very same time, while Judge Windmill wasn't presiding in that case, a letter was also sent to Judge George. Both of those factors come into play and go right to the issue with regard to Strickland. And quite honestly, Your Honor, or I'm sorry, correction to Greenspan. I'm sorry. I said Strickland, and I apologize, Your Honor. I misconstrued Greenspan. Thank you, Your Honor. Okay. Thank you for your argument. Thank you. Rebuttal? Rebuttal? Just some very brief comments in response to Mr. Fieke's arguments. First of all, as to the issue of awareness, and I think Judge Silverman has already pointed out that the judge was aware, at least to some degree, from the pleadings themselves that Chief Judge Windmill did have some awareness of the threats, both the original indictment, or indictments in this case, and then the subsequent motion to modify the conditions of detentions referenced specifically the two different threats that we're talking about. But more importantly, as to the issue of awareness, I don't think whether the judge himself was aware of the threats is an issue. And I think that's specifically spelled out by the Supreme Court in the Lilchenberg case, and I've addressed that in my brief. So I don't think that awareness, and that's one of the problems that I had with the judge's ruling here. He kept talking so much while I was only in that courthouse 30% to 40% of the time. I wasn't there at the specific time that specific threat was received. I submit, Your Honor, that his awareness of the threats is not an issue in this case. I think that the government has already conceded, even in the argument on the motion to recuse, that the threat itself was sufficient to cause recusal. The government conceded by telling the court at that argument that it specifically did not indict on that specific threat because of the possibility and the almost certainty that it would cause recusal. Okay. Thank you for your argument. Thank both sides for their argument. The case just argued will be submitted for decision, and we'll proceed to the next case on the argument calendar.
judges: Hawkins, Silverman, Gould